NATALIE K. WIGHT, OSB #035576
United States Attorney
District of Oregon
**GEOFFREY BARROW, D.C. #462662**
Geoffrey.Barrow@usdoj.gov
**NICHOLAS MEYERS, OSB #222743**
Nicholas.Meyers@usdoj.gov
Assistant United States Attorneys
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | 3:24-cr-00383-AN |
| v. | **GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION IN SUPPORT OF RELEASE** |
| **RAMIREZ DUMITRU,** | |
| **Defendant.** | |

### INTRODUCTION

The Honorable Jolie A. Russo ordered Defendant detained pending trial on October 23, 2024, finding after a hearing that no condition or combination of conditions would reasonably assure Defendant's appearance at trial. ECF 45. Defendant now moves to reopen that hearing,

and to seek reconsideration and release on conditions. This Court has scheduled a hearing on that matter for October 29.

The Government objects to reopening the detention hearing and, in the alternative, seeks continued detention if this Court does reopen the hearing. Defendant has not shown that (1) new "information exists that was not known to the movant at the time of the hearing" that would (2) "have a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f)(2). The Government continues to maintain that there is no condition or combination of conditions that will reasonably assure Defendant's appearance. 18 U.S.C. § 3142(f). Accordingly, Judge Russo's detention order should not be disturbed, and the Court should deny Defendant's motion to reopen the hearing. If this Court does reopen the hearing, Defendant should be detained.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On October 9, 2024, a Grand Jury in the District of Oregon indicted Defendant and 16 other defendants in Case Number 24-CR-383-AN for their participation in a conspiracy to fraudulently obtains goods (typically infant formula) using stolen Supplemental Nutrition Assistance Program (SNAP) benefits, and then to transport those goods from storage unit in Vancouver, Washington, to a business located in San Pedro, California, where the goods are re-sold on the black market.

Defendant, and nine of the other 16 defendants in this matter were arrested in the District of Oregon on October 22, 2024. On October 23, those defendants made initial appearances and were arraigned on a sixteen count Indictment, which charges violations of 18 U.S.C. § 1029,

Fraud and Related Activity in Connection with Access Devices; 18 U.S.C. § 371, Conspiracy to Defraud the United States; 18 U.S.C. § 2314, Transportation of Stolen Goods; and/or 18 U.S.C. § 2315, Sale or Receipt of Stolen Goods. Defendant and four codefendants were ordered detained by Judge Russo on October 23 after detention hearings. Two other defendants are scheduled to appear before the Court for their first detention hearing on October 29 and October 30, respectively. The Government did not seek the detention of three defendants, who Judge Russo ordered released on conditions.

### A. The Conspiracy

Defendant is a leader and organizer of an ongoing multi-state criminal conspiracy that has stolen more than $2.4 million dollars of benefits from hundreds of low-income and food-insecure individuals and families receiving Supplemental Nutrition Assistance Program ("SNAP") benefits throughout the United States.[1] The conspiracy uses the stolen SNAP benefits to fraudulently obtain large quantities of infant formula and other nonperishable food items from retailers, which are then stockpiled in residences and public storage units. The conspirators then consolidate and package the goods—thousands of pounds of infant formula and other food

---

[1] The Supplemental Nutrition Assistance Program, known as SNAP, is a federal program that provides nutrition benefits to low-income individuals and families. SNAP is administered by the United States Department of Agriculture (USDA), under the Food and Nutrition Service. SNAP benefits are limited for use at stores to purchase approved food items. In 1998, the USDA, through the State of Oregon Department of Human Services (DHS) Children, Adults and Families Division (CAF), converted from a traditional paper food stamp coupon system to what is known as an Electronic Benefit Transfer (EBT) card. The EBT card is an access device within the meaning of 18 U.S.C. § 1029(e)(1), in that it is a card containing a series of numbers which can be used to obtain things of value, specifically, eligible food items under the SNAP program. As of October 1, 2008, the official name of the federal Food Stamp Program changed to the Supplemental Nutrition Assistance Program (SNAP), but many people continue to refer to the program and related benefits as the Food Stamp Program and food stamp benefits, respectively.

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION IN SUPPORT OF RELEASE                                            Page 3

products—before shipping them across state lines in tractor trailers to be resold on the black market.

### B. Defendant's Conduct

Defendant Ramirez Dumitru is a 25-year-old citizen of Romania. Defendant is unlawfully present in the United States and has no legitimate employment. During this investigation, Defendant has moved from Oregon to California and back to Oregon, in an apparent attempt to avoid law enforcement.

On May 24, 2024, California state investigators executed a warrant at Dumitru's residence in Orange County, California where they found skimming devices and EBT account information used by the conspiracy in Oregon and Washington. When Dumitru learned of the warrant, he returned to Oregon and continued to engage in criminal conduct. When a search warrant was executed at his Portland, Oregon residence, investigators found more skimming devices, cards, and EBT account information.

The Orange County District Attorney's Office has informed the Government that it intends to promptly seek a warrant for Defendant's arrest in connection with the May 24, 2024, warrant described above. Additionally, the Montgomery County Texas District Attorney's Office has informed the Government that it plans to indict Defendant and seek a warrant for his arrest on October 29 related to criminal conduct in that jurisdiction almost identical to that alleged in the federal indictment.

//

//

//

**ARGUMENT**

A.   **Limited Authority for Reopening of Pretrial Detention Hearing.**

A detention hearing may be reopened "at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. §3142(f). Defendant has not established a basis for this Court to reopen the hearing, and nothing in the statute or rules allows defendant to seek reconsideration before a different Magistrate Judge instead of seeking review by the district court. Simply put, Defendant is not entitled to a mulligan after Judge Russo's order was not to his liking.

Courts have consistently interpreted this provision of 18 U.S.C. §3142(f) strictly. *See, e.g.*, *United States v. Terrone*, 454 F. Supp. 3d 1009, 1017 (D. Nev. 2020); *United States v. Bararia*, 2013 WL 1907782, at *4 (D. Nev. Mar. 12, 2013); *United States v. Ward*, 63 F.Supp.2d 1203, 1206-07 (C.D. Cal. 1999); *United States v. Dillon*, 938 F.2d 1412, 1415 (1st Cir. 1991). The rule requires the movant, whether prosecutor or defendant, to establish: (1) that information now exists that was not known to the movant at the initial detention hearing, and (2) the new information is material to release conditions regarding flight or dangerousness. *Id.*; *see also United States v. Bowens*, 2007 WL 2220501 (D. Ariz. Jul. 31, 2007) (citing *United States v. Hare*, 873 F.2d 796 (5th Cir. 1989)). "Generally, once a detention hearing is reopened, it is reopened to allow the court to receive any information, within reason, not submitted at the initial hearing, allowing the new information to be considered in context. If the information was available at the time of the original

hearing, the detention hearing need not be reopened." *Terrone*, 454 F. Supp. 3d 1009, 1017 (D. Nev. 2020) (cleaned up)

Here, because Defendant has made no effort to establish that information now exists that was not known to him at the time of the October 23, 2024 hearing that would have a material bearing on this issue, Defendant's request to reopen his detention hearing should be denied. *See* 18 U.S.C. §3142(f)

**B.    No Conditions Can Reasonably Assure Defendant's Appearance.**

Should the Court permit Defendant to reopen his detention hearing, the Court should, once again, order Defendant detained pending trial. This Court cannot fashion any combination of conditions that would reasonably assure Defendant's appearance at future proceedings. Defendant's personal circumstances and the nature and gravity of his offenses render Defendant too able and too incentivized to flee, and no conditions could effectively mitigate that risk. Defendant's specific conduct, victimizing hundreds of the most vulnerable members of our community, while facing warrants for substantially similar conduct in California and Texas, also poses a clear danger of economic harm to the community.

Each of the relevant statutory factors weigh in favor of his detention.

***1.    The Nature and Circumstances of the Offense***

The first factor—the nature and circumstances of the offense charged—contemplates consideration of not only the specific acts and charges alleged in the indictment, but also the potential penalty that may be imposed if the person is convicted. *See, e.g.*, *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008); *United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) (noting defendants faced respectively penalties of 35 and 70 years if convicted).

The government acknowledges that these crimes are not violent and do not carry presumptions of detention. Defendant's criminal conduct is, however, undeniably serious. While this District is familiar with cases involving multi-million-dollar fraud schemes perpetrated by defendants who target investors seeking to profit from investments that prove too good to be true, the Defendant and his coconspirators in this case stole from our community's most vulnerable victims. Parents struggling to feed their families and senior citizens who rely on public assistance found themselves unable to buy groceries because Defendant and his coconspirators used the victims' SNAP benefits to buy massive quantities of infant formula and energy drinks, which the Defendant and his coconspirators then resold. Simply put, Defendant's criminal conduct took food from hungry families; him victims didn't even know they had been targeted until they stood at the grocery checkout and discovered their EBT cards had been wiped clean. Unable to pay, they were forced to leave with nothing while Defendant cashed out their benefits.

Indeed, one victim—whose EBT benefits were stolen by Dumitru specifically and used to purchase infant formula for the conspiracy—described for investigators the humiliation she felt, and how "her heart dropped," when her EBT card was declined at the grocery store, and how she was forced to return home to her three children without food. Yet, as indicated in the chart below, which attempts to capture the scope and audacity of the conspiracy by illustrating the number of transactions certain of the defendants personally conducted, Dumitru *personally* victimized hundreds of individuals and families, just like the victim described above.

//

//

//

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION IN SUPPORT OF RELEASE**  Page 7

| Defendant | Date Range | Number of In-Store Transactions in Oregon and Washington | Online Transactions | Total Loss |
|---|---|---|---|---|
| Dumitru | 8/7/2023-3/14/2024 | 245 | | $46,000 |
| Miclescu | 4/4/2024-9/13/2024 | 511 | | $142,500 |
| Dunca | 12/1/2023-2/2/2024 | 95 | | $20,900 |
| Mareata | 6/1/2023-9/2/2024 | 57 | More than 2,500 | $394,000 |
| Spirea | 12/1/2023-8/22/2024 | 370 | | $55,400 |
| Barbosu | 6/11/2024-9/13/2024 | 375 | | $102,100 |

And the conspiracy as a whole moved substantially greater volumes of goods fraudulently obtained with stolen EBT benefits. Purely by reviewing shipping records for the conspiracy's Vancouver, Washington storage unit, investigators have identified at least seventeen shipments from Washington to California from September 2023 to September 2024. The total shipping weight exceeds 124,000 pounds, and the estimated value of the goods exceeds $2.4 million. The investigation is ongoing, and investigators expect to uncover additional relevant conduct.

  Behind each of these fraudulent transactions and the stolen EBT account information lies real people—low-income families struggling to make ends meet under the best of circumstances. Defendant's greed and that of his coconspirators exacerbated that struggle in a way that very few fraud victims have experienced. While some victims were eventually able to apply to have some of their benefits restored, that process takes time and undoubtedly failed to put food on their table the day they learned that they had been targeted by the Defendant's greed.

  Moreover, the nature and circumstances of the offenses are serious, and the penalties are appropriately severe. Underscoring the seriousness of the Defendant's conduct, the government

anticipates a base offense level under the applicable Sentencing Guidelines, prior to any departures, of 28 to 30, resulting in potential prison sentences of 78 to 121 months, providing each defendant with extra incentive to flee. *See Townsend*, 897 F.2d at 995; *see also United States v. Cisneros*, 328 F.3d 610, 618 (l0th Cir. 2003) (holding defendant was a flight risk because her knowledge of the seriousness of the charges against her gave her a strong incentive to abscond). This fact, combined with the fact that Defendant is a Romanian citizen unlawfully present in the United States, and that a conviction will make it practically inevitable that Defendant will subsequently be removed or deported from the United States, dramatically heightens the risk of flight.

### 2. The Weight of the Evidence

The second factor is the weight of the evidence. Although § 3142(g)(2) specifically enumerates weight of the evidence as a consideration in determining release, the Ninth Circuit has held that it is to be afforded less weight than the other statutory factors. *See Townsend*, 897 F.2d at 994; *Winsor*, 785 F.2d at 757. The weight of the evidence is, however, an important and relevant consideration in the Court's evaluation of whether a defendant "will fail to appear or will pose a danger to any person or to the community. *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985).

And here, there is simply no doubt that Defendant took the victim's EBT benefits. Voluminous video surveillance, grocery receipts, and other store records show Defendant stealing victims' EBT benefits at least 245 times over a less than on-year period. Moreover, and as noted above, when search warrants were executed at Defendant's residence in California on May 24, 2024, investigators found skimming devices and EBT account information used by the conspiracy

in both Oregon and Washington. Similarly, when a search warrant was executed at Defendant's Portland, Oregon residence last week, investigators found even more skimming devices, cards, and EBT account information.

This factor weighs heavily against Defendant's release.

### 3. The History and Characteristics of the Defendant

This factor also weighs significantly in favor of Defendant's detention. Although he has no known criminal history or drug problems, his ties to the community are minimal, and largely transferable. As noted above, Defendant has carried out his criminal conduct not only in the District of Oregon, but also in California and Texas, where authorities in both states are now seeking warrants for his arrest for the same criminal conduct. Should Defendant flee the District of Oregon, he can simply flee to another jurisdiction where he can continue to carry on his criminal conduct, just as he has done before.

Critically, there is no evidence that Defendant has been gainfully employed at *any* point in the recent past. Over the course of the Government's year-long investigation, law enforcement surveillance has never observed Defendant, or any of his coconspirators, travel to and from a legitimate place of employment. Indeed, the conspiracy—that is, fraudulent transactions using vulnerable victims' stolen EBT benefits—was Defendant's full-time occupation, as demonstrated by the hundreds of transactions in stolen EBT benefits he engaged in. Moreover, Defendant is unlawfully present in the United States and lacks any kind of employment authorization, which not only means Defendant will be unable to lawfully gain employment, but also that a conviction in this case will make it practically inevitable that Defendant will be removed or deported from the United States.

Each of these facts creates a significant risk of Defendants' non-appearance if they are released.

### 4. Danger to the Community

In *United States v. Twine*, the Ninth Circuit noted that the Bail Reform Act does not authorize pretrial detention "based *solely* on a finding of dangerousness." 344 F.3d 987 (9th Cir. 2003) (emphasis added); *see also United States v. Butler*, 165 F.R.D. 68, 71 (N.D. Ohio 1996). "Thus, the government may not request a detention hearing only on the allegations of danger to the community or another person" and the Government is required to demonstrate that there are grounds for a hearing under the specific provisions of either 3142(f)(1) or (f)(2). *Id*. at 71. "When there exists one or more grounds for holding a hearing under those provisions, the government may proceed on the theory of risk of flight and/or danger to the community or any other person." *Id*. Section 3142(f) may fairly be interpreted as authorizing pretrial detention "only upon proof of a likelihood of flight, a threatened obstruction of justice or a danger of recidivism in one or more of the crimes actually specified by the bail statute." *Butler*, 165 F.R.D. at 71 (quoting *United States v. Himler*, 797 F.2d 156, 160 (3d Cir. 1986) and citing *United States v. Byrd*, 969 F.2d 106 (5th Cir. 1992); *United States v. Ploof*, 851 F.2d 7 (1st Cir. 1988)). When the court has determined that a detention hearing is warranted, however, it may consider evidence relating to a defendant's danger to the community. Detention considerations are then guided by the factors set forth in 18 U.S.C. § 3142(g), and the specific consideration of "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." *Butler*, 165 F.R.D. at 71; 18 U.S.C. § 3142(g)(4). Accordingly, the government must first prove one or more of the grounds listed in 3142(f)(1) or (2) as a

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION IN SUPPORT OF RELEASE**   Page 11

prerequisite to the court considering the factor of danger to the community and whether there exist appropriate conditions of release.

The legislative history of the Bail Reform Act of 1984 makes clear that Congress intended that the "safety of the community" language in Section 3142 was expected to be given a broad construction. *See* S. Rep. No. 225, 98th Cong., 1st Sess. 12 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3195 ("The reference to safety of any other person [in 3142(g)(4)] is intended to cover the situation in which the safety of a particular identifiable individual, perhaps a victim or witness, is of concern, while the language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The Committee intends that *the concern about safety be given a broader construction than merely danger of harm involving physical violence*.") (emphasis added). Indeed, in the context of economic crimes "[t]he Ninth Circuit [has] held . . . that danger to the community may encompass pecuniary or economic harm." *United States v. Possino*, 2013 WL 1415108, at *7 (C.D. Cal. Apr. 8, 2013) (citing *United States v. Reynolds*, 956 F.2d 192, 192-93 (9th Cir. 1992)); *United States v. Cohen*, 2010 WL 5387757, at *9 (N.D. Cal. Dec. 20, 2010) ("Financial harm can constitute community danger, where there is a showing that defendant's fraudulent activity is ongoing or defendant has a propensity to continue fraudulent activity."); *see also United States v. Madoff*, 586 F. Supp. 2d 240, 252 (S.D.N.Y. 2009) (discussing cases).

Courts throughout the country have, therefore, appropriately construed the statute to find that protection of the community from economic harm is a valid objective of release conditions. *See United States v. Schenberger*, 498 F. Supp. 2d 738, 742 (D.N.J. 2007) (holding that "[a] danger to the community does not only include physical harm or violent behavior" and citing the

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION IN SUPPORT OF RELEASE**  Page 12

Senate Committee Report language reproduced above); *United States v. Persaud*, 2007 WL 1074906, at *1 (N.D.N.Y. Apr. 5, 2007) (concurring with the Magistrate Judge that "economic harm qualifies as a danger within the contemplation of the Bail Reform Act"); *United States v. LeClercq*, 2007 WL 4365601, at *4 (S.D. Fla. Dec. 13, 2007) (finding that a large bond was necessary to, among other things, "protect the community from additional economic harm"); *United States v. Gentry*, 455 F. Supp. 2d 1018, 1032 (D. Ariz. 2006) (in a fraud and money laundering case, in determining whether pretrial detention was appropriate, the court held that danger to the community under Section 3142(g) "may be assessed in terms other than the use of force or violence . . . [including] economic danger to the community"); *see also Reynolds*, 956 F.2d at 193 (9th Cir. 1992) (postconviction for mail fraud and witness tampering, the Court held that "danger may, at least in some cases, encompass pecuniary or economic harm.").[2]

    In this case, the financial harm to the community is particularly egregious. The Defendant personally, and the conspiracy collectively, stole from some of the community's most vulnerable victims—low-income families who rely on public assistance to feed themselves—as part of a wide-ranging and sophisticated scheme. The victims had no way to know that they had been targeted and no real way to protect themselves in the future. Even putting aside the significant risk of flight Defendant presents, he has significant financial incentives to continue his criminal conduct, either in this community or elsewhere in the United States. Indeed, he has *already*

---

[2] Pretrial detention cases in which bail is determined pursuant to Section 3142 routinely cite the principle set forth in post-conviction cases, in which bail is determined pursuant to 18 U.S.C. § 3143, that economic harm may be considered a danger to the community. *See, e.g., United States v. Zaragoza*, 2008 WL 686825, at* 3 (N.D. Cal. Mar. 11, 2008) (citing the principle regarding "pecuniary or economic harm" from *Reynolds* in the context of a pretrial detention analysis); *Gentry*, 455 F. Supp. 2d at 1032 (same).

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION IN**           **Page 13**
**SUPPORT OF RELEASE**

demonstrated his willingness to commit the same types of crimes in California and Texas. Nothing short of detention will prevent Defendant from victimizing more vulnerable people.

**C.     Defendant's Release Plan is Untenable.**

On October 28, Defendant filed a Motion and Memorandum in Support of Release. ECF 91. Containing little relevant detail, Defendant's motion proposes that he be allowed to reside in Riverside, California at the residence of Doru Moise, vaguely described as "a family friend of Mr. Dumitru's extended family." Defendant concedes, moreover, that Pretrial Services has not confirmed this information, nor has it independently determined that this residence is suitable.

More importantly, conspicuous by its absence in Defendant's motion is any mention of the alleged criminal conduct in Orange County, California (only a short drive away from Riverside) despite the fact that this conduct was discussed both in the Government's previous detention memo, ECF 41, and at the October 23 hearing before Judge Russo. Nor does Defendant explain how merely residing with a newly identified "family friend" outside the District of Oregon alleviates *any* of the concerns identified by the Government—and found persuasive by Judge Russo—that Defendant was a significant flight risk. Indeed, as discussed both herein and at the October 23 hearing, Defendant fled California after law enforcement executed a search warrant at his residence in Orange County, where they found skimming devices and EBT account information used by the conspiracy, and upon returning to Oregon, Defendant almost immediately resumed his criminal conduct, stealing EBT benefits no less than 245 times from low-income families in less than a year.

Moreover, the Defendant's newfound desire to reside in Riverside, California does nothing to address Defendant's criminal conduct in Texas. As noted above, the Montgomery County Texas

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION IN SUPPORT OF RELEASE**     Page 14

District Attorney's Office has informed the Government that it plans to indict Defendant and seek a warrant for his arrest on October 29 related to the very same kind of criminal alleged in the indictment here. There is little doubt that, were Defendant released to reside in California, he would be extradited to Texas to face those charges. On that basis alone, Defendant's proposed release plan should be a nonstarter.

Given these facts, Defendant's release plan is wholly inadequate and fails to address any of the factors that make Defendant a serious and unmitigable risk of nonappearance at trial.

## CONCLUSION

Defendant's motion to reopen the October 23 hearing should be denied. Moreover, Given the manifest risk that Defendant will flee prosecution, the Government respectfully moves this Court to order that Defendant be detained.

Dated: October 29, 2024                    Respectfully submitted,

                                                           NATALIE K. WIGHT
                                                           United States Attorney

                                                           */s/ Geoffrey A. Barrow*
                                                           GEOFFREY A BARROW
                                                           NICHOLAS D. MEYERS
                                                           Assistant United States Attorneys